John DOE, Plaintiff,

v.

UNIVERSITY OF MICHIGAN, Defendant.

Civ. No. 89–71683.

United States District Court, E.D. Michigan, Southern Division.

Sept. 22, 1989.

Addendum Sept. 25, 1989.

Robert A. Sedler, Paul J. Denenfeld, for plaintiff.

Dickinson, Wright, Moon, Van Dusen & Freeman by Henry W. Saad, Joseph C. Marshall, III, Robert Powell, Elizabeth M. Pezzetti, Bloomfield Hills, Mich., for defendant.

## OPINION

COHN, District Judge.

[T]aking stock of the legal system's own limitations, we must realize that judges, being human, will not only make mistakes but will sometimes succumb to the pressures exerted by the government to allow restraints [on speech] that ought not to be allowed. To guard against these possibilities we must give judges as little room to maneuver as possible and, again, extend the boundary of the realm of protected speech into the hinterlands of speech in order to minimize the potential harm from judicial miscalculation and misdeeds.

> L. Bollinger, *The Tolerant Society* 78 (1986).

## I. INTRODUCTION

It is an unfortunate fact of our constitutional system that the ideals of freedom and equality are often in conflict. The difficult and sometimes painful task of our political and legal institutions is to mediate the appropriate balance between these two competing values. Recently, the University of Michigan at Ann Arbor (the University), a state-chartered university, *see* Mich. Const. art. VIII, adopted a Policy on Discrimination and Discriminatory Harassment of Students in the University Environment (the Policy) in an attempt to curb what the University's governing Board of Regents (Regents) viewed as a rising tide of racial intolerance and harassment on campus. The Policy prohibited individuals, under the penalty of sanctions, from "stigmatizing or victimizing" individuals or groups on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status. However laudable or appropriate an effort this may have been, the Court found that the Policy swept within its scope a significant amount of "verbal conduct" or "verbal behavior" which is unquestionably protected speech under the First Amendment. Accordingly, the Court granted plaintiff

John Doe's (Doe)[1] prayer for a permanent injunction as to those parts of the Policy restricting speech activity, but denied the injunction as to the Policy's regulation of physical conduct. The reasons follow.[2]

## II. FACTS GENERALLY

According to the University, in the last three years incidents of racism and racial harassment appeared to become increasingly frequent at the University. For example, on January 27, 1987, unknown persons distributed a flier declaring "open season" on blacks, which it referred to as "saucer lips, porch monkeys, and jigaboos." On February 4, 1987, a student disc jockey at an on-campus radio station allowed racist jokes to be broadcast. At a demonstration protesting these incidents, a Ku Klux Klan uniform was displayed from a dormitory window. These events and others prompted the University's President on February 19, 1987 to issue a statement expressing outrage and reaffirming the University's commitment to maintaining a racially, ethnically, and culturally diverse campus. The University was unable to identify any of the perpetrators. It is unknown whether the culprits were students. Likewise, there was no evidence to suggest that these were anything other than isolated and purposeless acts.

On March 5, 1987, the Chairperson of the State House of Representatives Appropriations Subcommittee on Higher Education held a public hearing on the problem of racism at the University in Ann Arbor. Forty-eight speakers addressed the subcommittee and an audience of about 600. The speakers were uniformly critical of the University's response to racial incidents and accused it of generally ignoring the problems of minority students. At the close of the hearing, the Chairperson was quoted as stating

> Michigan legislators will not tolerate racism on the campus of a state institution ... Racism has no place in this day and age.... [The subcommittee] will make our decision [on appropriations for the University] during their budget discussions of the next few weeks.... Some things have to change. The committee members want to meet with [the University's President]. Holding up funds as a club may be part of our response, but that will predicate on how the university responds.

Following the hearing, the United Coalition Against Racism (UCAR), a campus anti-discrimination group, announced that it intended to file a class action civil rights suit against the University "for not maintaining or creating a non-racist, non-violent atmosphere" on campus. Following discussions with a national civil rights leader in March of 1987, the University adopted a six-point action plan to remedy the racial problems on campus. This included the adoption of "[a]n anti-racial harassment policy ... as a component of the University's rules and regulations with appropriate sanctions specified."

On September 22, 1987, the University's President issued a memorandum to the various schools of the University directing them to refer complaints of discriminatory harassment to the Affirmative Action Office in the Office of the President for monitoring and evaluation. An analysis of the complaints which were filed reflects that the University had neither independently verified the accuracy of the complaints nor identified a specific perpetrator for most of the incidents described. Likewise, there is no way by which it can be determined whether such incidents occur more fre-

---

1. Plaintiff proceeded under the pseudonym "John Doe" to preserve his privacy and protect himself from any adverse publicity arising from this case. The University did not contest plaintiff's right to proceed anonymously.

    Doe was represented by counsel provided by the American Civil Liberties Union. His attorneys are to be commended for the consistently high quality of the representation they provided Doe in this case.

2. The reasons for the Court's decision were stated on the record at a hearing held on August 25, 1989. At that time, the Court stated that it would issue a more detailed written opinion at a later date. To the extent that this opinion is at variance with the Court's August 25, 1989 bench opinion, it is the written opinion which controls. *See Schmidt v. Plains Electric Inc.,* 281 N.W.2d 794 (N.D.1979).

quently at the University than other comparable institutions.

In December 1987, the University President resigned and a former University president was temporarily appointed to the post until a permanent successor was chosen. On December 14, 1987, the Acting President circulated a confidential memorandum to the University's executive officers detailing a proposal for an anti-discrimination disciplinary policy. The proposed policy prohibited "[h]arassment of anyone through word or deed or any other behavior which discriminates on the basis of inappropriate criteria." The Acting President recognized at the time that the proposed policy would engender serious First Amendment problems, but reasoned that

> just as an individual cannot shout "Fire!" in a crowded theater and then claim immunity from prosecution for causing a riot on the basis of exercising his rights of free speech, so a great many American universities have taken the position that students at a university cannot by speaking or writing discriminatory remarks which seriously offend many individuals beyond the immediate victim, and which, therefore detract from the necessary educational climate of a campus, claim immunity from a campus disciplinary proceeding. I believe that position to be valid.

The other "American universities" to which the President referred to were not identified at any time. Nor was any document presented to the Court in any form which "valid[ates]" this "position."

At the January 15, 1988 meeting of the Regents, the Acting President informed the Board that he been working on a proposed policy on student discipline dealing with racial harassment pursuant to his general authority under Regents' Bylaw 2.01.[3] He stated that he was taking this action in response to widespread complaints that the University could not or would not enforce its existing regulations concerning racial harassment. Adoption of a policy, he noted, "would enable the University to take the position that it was willing to do something about this issue."[4] The Acting President conceded that any proposed policy would implicate serious civil liberties questions, but he expressed a commitment to pursue the problem nevertheless.

Following the January meeting, the Acting President appointed the Director of the University Office of Affirmative Action (Director) to draft a policy. The proposed policy went through twelve drafts. Throughout this process, the Director consulted with a lawyer in the Office of University Counsel and perhaps several University of Michigan Law School professors.[5] On February 29, 1988, a proposed policy was published in the *University Record* and faculty, students, and staff were invited to comment. A public hearing on the proposed policy was held on March 16, 1988 at which numerous speakers commented and suggested various changes and refinements. The next day, the Acting President introduced the draft policy for consideration at the monthly Regents meeting. In the ensuing discussion, one Regent expressed concern that the policy would unduly restrict students' free speech rights. A second Regent criticized the policy on the grounds that it failed to address the problem of students heckling outside speakers

---

3. Regents' By-law 2.01 provides that in addition to other duties and functions, the President of the University shall exercise such general powers as to

    general oversight of teaching and research programs; the libraries, museums, and other supporting services; the general welfare of the faculty and supporting staffs; the business and financial welfare of the University; and the maintenance of health, diligence, and order among the students.

4. Regents' By-law 7.02, adopted in 1985, established the University Council, a formal body composed of faculty, students, and administrators, charged with the responsibility for drafting uniform regulations governing the conduct of members of the community. As of January, 1988, the University Council had failed to act. This was apparently the reason why the Regents bypassed the University Council in formulating the Policy.

5. This equivocation is attributable to the fact that consultations with law professors were unaccompanied by the exchange of any formal correspondence or memoranda.

who came to the campus. The Regents agreed that the final draft incorporating the suggested changes would be presented at the next meeting. University officers also promised that an interpretive guide with examples of sanctionable conduct would be issued as an authoritative guide for the benefit of the University community. At the April 14, 1988 Regents meeting, the Policy was unanimously adopted. It became effective on May 31, 1988 and was set to expire on December 31, 1989 unless reenacted.

## III. THE UNIVERSITY OF MICHIGAN POLICY ON DISCRIMINATION AND DISCRIMINATORY HARASSMENT

### A. *The Terms of the Policy*

The Policy established a three-tiered system whereby the degree of regulation was dependent on the location of the conduct at issue. The broadest range of speech and dialogue was "tolerated" in variously described public parts of the campus. Only an act of physical violence or destruction of property was considered sanctionable in these settings. Publications sponsored by the University such as the *Michigan Daily* and the *Michigan Review* were not subject to regulation. The conduct of students living in University housing is primarily governed by the standard provisions of individual leases, however the Policy appeared to apply in this setting as well.[6] The Policy by its terms applied specifically to "[e]ducational and academic centers, such as classroom buildings, libraries, research laboratories, recreation and study centers[.]" In these areas, persons were subject to discipline for:

1. Any behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status, and that

a. Involves an express or implied threat to an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety; or

b. Has the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety; or

c. Creates an intimidating, hostile, or demeaning environment for educational pursuits, employment or participation in University sponsored extra-curricular activities.

2. Sexual advances, requests for sexual favors, and verbal or physical conduct that stigmatizes or victimizes an individual on the basis of sex or sexual orientation where such behavior:

a. Involves an express or implied threat to an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety; or

b. Has the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety; or

c. Creates an intimidating, hostile, or demeaning environment for educational pursuits, employment or participation in University sponsored extra-curricular activities.

On August 22, 1989, the University publicly announced, without prior notice to the Court or Doe, that it was withdrawing section 1(c) on the grounds that "a need exists for further explanation and clarification of [that section] of the policy." No reason was given why the analogous provision in paragraph 2(c) was allowed to stand.

The Policy by its terms recognizes that certain speech which might be considered in violation may not be sanctionable, stating: "The Office of the General Coun-

---

6. The constitutionality of the Policy as it relates to verbal conduct and verbal behavior in University housing is not raised in the complaint.

The standard provisions of the University housing lease are not part of the record.

sel will rule on any claim that conduct which is the subject of a formal hearing is constitutionally protected by the first amendment."

## B. *Hearing Procedures*

Any member of the University community could initiate the process leading to sanctions by either filing a formal complaint with an appropriate University office or by seeking informal counseling with described University officials and support centers. The Policy states that it is the preference of the University to employ informal mechanisms for mediation and resolution of complaints whenever possible and in fact most complainants have chosen to proceed informally. University officers are authorized to act as mediators and employ educational sanctions, community service, disciplinary warnings, and restitution in attempting to reach a settlement acceptable to both the victim and the perpetrator. None of the records relating to enforcement of the Policy are to be included in a student's academic files, and the records so generated are to be maintained in accordance with applicable privacy laws.

Where a negotiated settlement proves impossible, a formal complaint would be filed with the Administrator of Complaints of Discriminatory Behavior in the Office of Vice–President of Student Services (Policy Administrator). The Policy Administrator would then undertake an independent investigation of the alleged incident to determine whether there is sufficient evidence of a violation to warrant the initiation of a formal hearing. If a hearing were necessary, a panel consisting of four students and one tenured faculty member would be convened to pass on the merits. The accused student would then be notified that a complaint had been filed against him or her, the specific charges, the identity of the complaining witness, and the facts of the complaint and investigation. At the hearing, the Policy Administrator would be responsible for presenting the charges against the accused student. Both the accused student and the complainant had the right to call and cross-examine witnesses and give testimony. The accused student

had the right to have an attorney present at the hearing, but the attorney could not participate fully in the hearing unless suspension or expulsion were likely sanctions. If a majority of the hearing panel found by clear and convincing evidence that the Policy had been violated, they were to recommend an appropriate sanction. If the accused student was dissatisfied with the panel's decision, he or she had the right to have an appellate tribunal consisting of two students and the Vice–President for Student Services independently review the conviction and sanction.

## C. *Sanctions*

The Policy provided for progressive discipline based on the severity of the violation. It stated that the University encouraged hearing panels to impose sanctions that include an educational element in order to sensitize the perpetrator to the harmfulness of his or her conduct. The Policy provided, however, that compulsory class attendance should not be imposed "in an attempt to change deeply held religious or moral convictions." Depending on the intent of the accused student, the effect of the conduct, and whether the accused student is a repeat offender, one or more of the following sanctions may be imposed: (1) formal reprimand; (2) community service; (3) class attendance; (4) restitution; (5) removal from University housing; (6) suspension from specific courses and activities; (7) suspension; (8) expulsion. The sanctions of suspension and expulsion could only be imposed for violent or dangerous acts, repeated offenses, or a willful failure to comply with a lesser sanction. The University President could set aside or lessen any sanction.

## D. *Interpretive Guide*

Shortly after the promulgation of the policy in the fall of 1988, the University Office of Affirmative Action issued an interpretive guide (Guide) entitled *What Students Should Know about Discrimination and Discriminatory Harassment by Students in the University Environment.* The Guide purported to be an authoritative

interpretation of the Policy and provided examples of sanctionable conduct. These included:

A flyer containing racist threats distributed in a residence hall.

Racist graffiti written on the door of an Asian student's study carrel.

A male student makes remarks in class like "Women just aren't as good in this field as men," thus creating a hostile learning atmosphere for female classmates.

Students in a residence hall have a floor party and invite everyone on their floor except one person because they think she might be a lesbian.

A black student is confronted and racially insulted by two white students in a cafeteria.

Male students leave pornographic pictures and jokes on the desk of a female graduate student.

Two men demand that their roommate in the residence hall move out and be tested for AIDS.

In addition, the Guide contained a separate section entitled "You are a harasser when . . ." which contains the following examples of discriminatory conduct:

You exclude someone from a study group because that person is of a different race, sex, or ethnic origin than you are.

You tell jokes about gay men and lesbians.

Your student organization sponsors entertainment that includes a comedian who slurs Hispanics.

You display a confederate flag on the door of your room in the residence hall.

You laugh at a joke about someone in your class who stutters.

You make obscene telephone calls or send racist notes or computer messages.

You comment in a derogatory way about a particular person or group's physical appearance or sexual orientation, or their cultural origins, or religious beliefs.

It was not clear whether each of these actions would subject a student to sanctions, although the title of the section suggests that they would. It was also unclear why these additional examples were listed separately from those in the section entitled "What is Discriminatory Harassment."

According to the University, the Guide was withdrawn at an unknown date in the winter of 1989, because "the information in it was not accurate." The withdrawal had not been announced publicly as of the date this case was filed.[7]

## IV. STANDING

■ Doe is a psychology graduate student. His specialty is the field of biopsychology, which he describes as the interdisciplinary study of the biological bases of individual differences in personality traits and mental abilities. Doe said that certain controversial theories positing biologically-based differences between sexes and races might be perceived as "sexist" and "racist" by some students, and he feared that discussion of such theories might be sanctionable under the Policy. He asserted that his right to freely and openly discuss these theories was impermissibly chilled, and he requested that the Policy be declared unconstitutional and enjoined on the grounds of vagueness and overbreadth.

The University in response questioned Doe's standing to challenge the Policy, saying that it has never been applied to sanction classroom discussion of legitimate ideas and that Doe did not demonstrate a credible threat of enforcement as to himself. The University also asserts that Doe could not base his claim on the free speech interests of unspecified third parties. These arguments served only to diminish the credibility of the University's argument on the merits because it appeared that it

---

7. The Policy was published in pamphlet form with a blue cover and a yellow slash down the center. The Guide was published in pamphlet form with the opposite color scheme. The University's colors are maize and blue. The graphic layout of the Policy and Guide pamphlets served to reinforce the Court's view that the two statements were integrally related. Indeed, at the hearing on August 25, 1989, the Court observed that the withdrawal of the Guide while retaining the Policy was like taking the maize out of the "maize and blue."

sought to avoid coming to grips with the constitutionality of the Policy.

Article III of the Constitution limits the judicial power of federal courts to live cases and controversies. Traditionally, federal courts have interpreted this limitation to bar a party from maintaining a lawsuit unless the party had a sufficient stake in the outcome "as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 1703, 7 L.Ed.2d 663 (1962). To establish such an interest, a litigant must show that he or she has personally suffered some actual or threatened injury from the putatively illegal conduct of the defendant, that the injury could fairly be traced to the illegal conduct, and that it would be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The challenged conduct must cause or threaten to cause a direct injury, *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), which is distinct and palpable, *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Doe clearly met this standard.

It is well settled that an individual has standing to challenge the constitutionality of a penal statute if he or she can demonstrate a realistic and credible threat of enforcement. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The mere possibility that a person might be subject to the sanctions of a statute is insufficient. *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375 (D.C.Cir.1984). Rather, the threat of enforcement must be specific and direct and against a particular party. *Houston v. Hill,* 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987). It is not necessary, however, that an individual first be exposed to prosecution in order to have standing to challenge a statute which is claimed to deter the exercise of constitutional rights. *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

Were the Court to look only at the plain language of the Policy, it might have to agree with the University that Doe could not have realistically alleged a genuine and credible threat of enforcement. The Policy prohibited conduct which "stigmatizes or victimizes" students on the basis of "race, ethnicity, religion, sex, sexual orientation" and other invidious factors. However, the terms "stigmatize" and "victimize" are not self defining.[8] These words can only be understood with reference to some exogenous value system. What one individual might find victimizing or stigmatizing, another individual might not. Accordingly, the likelihood of a complaint being filed in response to Doe's anticipated classroom comments would be speculative at best. In addition, even if a complaint was filed, the Policy requires that considerations of freedom of speech and academic freedom be given due consideration by the Policy Administrator in determining whether a formal hearing is warranted. Even if a student were to find Doe's views victimizing or stigmatizing, the Policy Administrator might well conclude that his speech was protected by the First Amendment and refuse to take any action. Thus, if the plain language of the policy were all the Court had before it, it would probably conclude that Doe had failed to demonstrate a reasonable probability that the Policy would be construed to cover his anticipated speech.

The slate was not so clean, however. The Court had before it not only the terms of the Policy, but also its legislative history, the Guide, and experiences gleaned from a year of enforcement. The record clearly shows that there existed a realistic

---

**8.** "Stigmatize" is defined in *The American Heritage Dictionary* 1266 (1978) as "1. To characterize or brand as disgraceful or ignominious mark with stigma or brand. 2. To brand or mark with a stigma or stigmata. 3. To cause stigmata to appear on." "Victimize" is defined as "1. To subject to swindle or fraud; to cause discomfort or suffering to. 2. To make a victim of as if by slaying." *Id.* at 1428.

and credible threat that Doe could be sanctioned were he to discuss certain biopsychological theories.

The legislative history demonstrated that the Policy was originally conceived as a remedy for racially insensitive and derogatory remarks which students found offensive. The Acting President's December 14, 1987 memorandum to the University's Executive Officers stated that the proposed anti-harassment policy would sanction any "remarks which seriously offend many individuals beyond the immediate victim, and which, therefore detract from the necessary educational climate of a campus." The University pointed out that the December 14 Memorandum was simply a tentative starting point for discussion and the Policy went though numerous drafts before it reached its final form. This may have well been so. However, the Memorandum nevertheless illustrated the *intent*, never subsequently contradicted, underlying the Policy and the University's general approach to the problems it perceived. Nothing in the legislative materials filed with the Court suggested that the Acting President's theoretical approach was substantially altered as the Policy developed. On the contrary, as late as February 2, 1988, the University attorney who researched the law and assisted in the drafting of the Policy, wrote a memorandum in which he conceded that merely offensive speech was constitutionally protected, but declared that

> [w]e cannot be frustrated by the reluctance of the courts and the common law to recognize the personal damage that is caused by discriminatory speech, nor should our policy attempt to conform to traditional methods of identifying harmful speech. Rather the University should identify and prohibit that speech that causes damage to individuals within the community.

The record before the Court thus indicated that the drafters of the policy intended that speech need only be offensive to be sanctionable.

The Guide also suggested that the kinds of ideas Doe wished to discuss would be sanctionable. The Guide was the University's authoritative interpretation of the Policy. It explicitly stated that an example of sanctionable conduct would include:

> A male student makes remarks in class like "Women just aren't as good in this field as men," thus creating a hostile learning atmosphere for female classmates.

Doe said in an affidavit that he would like to discuss questions relating to sex and race differences in his capacity as a teaching assistant in Psychology 430, Comparative Animal Behavior. He went on to say:

> An appropriate topic for discussion in the discussion groups is sexual differences between male and female mammals, including humans. [One] ... hypothesis regarding sex differences in mental abilities is that men as a group do better than women in some spatially related mental tasks partly because of a biological difference. This may partly explain, for example, why many more men than women chose to enter the engineering profession.

Doe also said that some students and teachers regarded such theories as "sexist" and he feared that he might be charged with a violation of the Policy if he were to discuss them. In light of the statements in the Guide, such fears could not be dismissed as speculative and conjectural. The ideas discussed in Doe's field of study bear sufficient similarity to ideas denounced as "harassing" in the Guide to constitute a realistic and specific threat of prosecution.

The University argued that it had withdrawn the Guide on the grounds that it contained some "inaccuracies." However, at best, this decision was conveyed only to department heads and other responsible officials and, as noted, had not been announced to the general University community at the time this lawsuit was filed. For the purposes of determining Doe's standing, the University's action came too late to render Doe's fear of enforcement illusory. *See United States v. W.T. Grant & Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

Finally, the record of the University's enforcement of the Policy over the past year suggested that students in the classroom and research setting who offended others by discussing ideas deemed controversial could be and were subject to discipline. A review of the University's discriminatory harassment complaint files suggested that on at least three separate occasions, students were disciplined or threatened with discipline for comments made in a classroom setting. These are discipline files 88–12–21, 88–9–05, and 88–9–07, discussed *infra*. At least one student was subject to a formal hearing because he stated in the context of a social work research class that he believed that homosexuality was a disease that could be psychologically treated. As will be discussed below, the Policy was enforced so broadly and indiscriminately, that plaintiff's fears of prosecution were entirely reasonable. Accordingly, the Court found that Doe had standing to challenge the policy.[9]

## V. VAGUENESS AND OVERBREADTH

Doe initially moved for a preliminary injunction against the Policy on the grounds that it was unconstitutionally vague and overbroad and that it chilled speech and conduct protected by the First Amendment. The University in response said that the Policy has never been applied to reach protected speech and a preliminary injunction should therefore be denied. At the August 25, 1989 hearing on Doe's motion, the Court, without objection, consolidated the hearing on the motion with the trial on the

merits pursuant to Fed.R.Civ.P. 65(a)(2).[10] This obviated the need to consider whether Doe had made the requisite showing to warrant the issuance of a preliminary injunction. *See Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th Cir. 1977).

### A. *Scope of Permissible Regulation*

Before inquiring whether the policy is impermissibly vague and overbroad, it would be helpful to first distinguish between verbal conduct and verbal acts that are generally protected by the First Amendment and those that are not. It is the latter class of behavior that the University may legitimately regulate.

Although the line is sometimes difficult to draw with precision, the Court must distinguish at the outset between the First Amendment protection of so-called "pure speech" and mere conduct. *See* L. Tribe, *Constitutional Law* sec. 12–7 (2d Ed.1988). As to the latter, it can be safely said that most extreme and blatant forms of discriminatory conduct are not protected by the First Amendment, and indeed are punishable by a variety of state and federal criminal laws and subject to civil actions. Discrimination in employment, education, and government benefits on the basis of race, sex, ethnicity, and religion are prohibited by the constitution and both state and federal statutes.[11] *See, e.g.,* U.S. Const. amends. V, XIV; Mich Const. art. I, sec. 2; 42 U.S.C. sec. 2000e–16 (employment); Mich.Stat.Ann. sec. 3.548(202) [M.C.L.A. sec. 37.2202] (employment); 42 U.S.C. sec. 2000c (education); Mich. Const. art. VIII, sec. 2 (education); 42 U.S.C. sec. 2000d

---

**9.** In view of the fact that there was a substantial probability that the Policy might be enforced against Doe, there was no need to consider whether he has standing to assert the rights of third parties, *see, e.g., Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), or whether the mere existence of the Policy has sufficiently "chilled" the intellectual atmosphere of the University as to make out a concrete injury-in-fact, *see, e.g., Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

**10.** The University reserved the right to supplement the record to clarify any disputed factual issues,

which it subsequently did. Doe chose not to respond. Nothing in the University's clarification papers materially changed any of the facts the Court relied upon in reaching its decision.

**11.** There are no federal statutory or constitutional provisions against discrimination on the basis of sexual orientation or Vietnam Veteran status. *See Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). This hiatus does not mean that the University may not adopt regulations more protective than existing law, provided, of course, such regulation does not otherwise offend the state or federal constitutions.

(government benefits). In addition, the state provides criminal penalties and civil remedies for assault and battery, Mich. Stat.Ann. secs. 28.276–28.278 [M.C.L.A. secs. 750.81–750.83]; Mich.Stat.Ann. sec. 28.344(2) [M.C.L.A. sec. 750.1476] (physical assault for purposes of ethnic intimidation).[12] *Tinkler v. Richter,* 295 Mich. 396, 295 N.W. 201 (1940) (civil action for assault and battery), and vandalism and property damage, Mich.Stat.Ann. 28.609(1) [M.C.L.A. sec. 750.377a]; Mich.Stat.Ann. sec. 28.344(2) [M.C.L.A. sec. 750.1476] (property damage and destruction for purposes of ethnic intimidation); *Thoma v. Tracy Motor Sales,* 360 Mich. 434, 104 N.W.2d 360 (1960) (civil action for property destruction). Federal law imposes civil and criminal sanctions against persons depriving or conspiring to deprive others of rights guaranteed by the United States constitution. 42 U.S.C. secs. 1983, 1985 (civil); 18 U.S.C. secs. 241–242 (criminal).

Many forms of sexually abusive and harassing conduct are also sanctionable. These would include abduction, Mich.Stat. Ann. secs. 28.201–28.202 [M.C.L.A. secs. 750.11–750.12], rape, and other forms of criminal sexual conduct, Mich.Stat.Ann. sec. 28.788; *Totten v. Totten,* 172 Mich. 565, 138 N.W. 257 (1912) (civil action for rape). The dissemination of legally obscene materials is also a crime under state law. Mich.Stat.Ann. sec. 28.579 [M.C.L.A. sec. 750.347]. In addition, a civil remedy exists for women who are subjected to demands for sexual favors by employers as an express or implied *quid pro quo* for employment benefits. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Minorities or women who are exposed to such extreme and pervasive workplace harassment as to create a hostile or offensive working environment are also entitled to civil damages. *Id.* (and cases cited therein). The First Amendment presents no obstacle to the establishment of internal University sanctions as to any of these categories of conduct, over and above any remedies already supplied by state or federal law.

While the University's power to regulate so-called pure speech is far more limited, *see United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), certain categories can be generally described as unprotected by the First Amendment. It is clear that so-called "fighting words" are not entitled to First Amendment protection. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). These would include "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting words'—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572, 62 S.Ct. at 769. Under certain circumstances racial and ethnic epithets, slurs, and insults might fall within this description and could constitutionally be prohibited by the University. In addition, such speech may also be sufficient to state a claim for common law intentional infliction of emotional distress. *Ledsinger v. Burmeister,* 114 Mich. App. 12, 18–19, 318 N.W.2d 558 (1982). Credible threats of violence or property damage made with the specific intent to harass or intimidate the victim because of his race, sex, religion, or national origin is punishable both criminally and civilly under state law. Mich.Stat.Ann. sec. 28.344(2) [M.C.L.A. sec. 750.1476]. Similarly, speech which has the effect of inciting imminent lawless action and which is likely to incite such action may also be lawfully punished.

12. Recently, the Michigan legislature enacted a law making it a criminal offense to commit an act of "ethnic intimidation," which is defined as the causing of physical contact with another, the damaging of real or personal property, or making a credible threat to do so with the specific intent to "intimidate or harass another person because of that person's race, color, religion, gender, or national origin[.]" Mich.Stat.Ann. sec. 28.344(2) [M.C.L.A. sec. 750.1476]. The statute prescribes a maximum penalty of not more than two years imprisonment or $5,000 fine or both. It also establishes a civil remedy for such conduct entitling a successful plaintiff to treble damages or $2,000, whichever is greater, and attorney's fees.

For a survey of similar anti-hate crime legislation in other states, *see* Anti–Defamation League, *Hate Crimes Statutes: A Response to Anti–Semitism, Vandalism, and Violent Bigotry* (1988).

*Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Civil damages are available for speech which creates a hostile or abusive working environment on the basis of race or sex. *Meritor, supra.* Legally obscene speech is unprotected by the First Amendment, *Miller v. California,* 413 U.S. 15, 22, 93 S.Ct. 2607, 2613, 37 L.Ed.2d 419 (1973), as are materials involving the sexual exploitation of children. *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Similarly, speech which is "vulgar," "offensive," and "shocking" is not entitled to absolute constitutional protection in all circumstances. *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *FCC v. Pacifica Foundation, supra.* Certain kinds of libel and slander are also not protected. *Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), including possibly group libel, *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952). Finally, the University may subject all speech and conduct to reasonable and nondiscriminatory time, place, and manner restrictions which are narrowly tailored and which leave open ample alternative means of communication. *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). If the Policy had the effect of only regulating in these areas, it is unlikely that any constitutional problem would have arisen.

What the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed. *Texas v. Johnson,* — U.S. —, —, 109 S.Ct. 2533, 105 L.Ed.2d 342, 360 (1989); *Chicago Police Department v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972); *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971); *NAACP v. Button,* 371 U.S. 415, 445, 83 S.Ct. 328, 852, 9 L.Ed.2d 405 (1963); *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). As the Supreme Court stated in *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943):

> If there is any star fixed in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people. *Texas v. Johnson, supra,* — U.S. at —, 109 S.Ct. at 2544–45, 105 L.Ed.2d at 360; *Hustler Magazine v. Falwell,* 485 U.S. 46, 55–56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988); *City Counsel of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984); *Federal Communications Commission v. Pacifica Foundation,* 438 U.S. 726, 745–46, 98 S.Ct. 3026, 3038–39, 57 L.Ed.2d 1073 (1978); *Collin v. Smith,* 578 F.2d 1197, 1205–07 (7th Cir.), *cert. denied* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978). As the Supreme Court noted in *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969):

> It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers. *See e.g. Cox v. Louisiana (I),* [379 U.S. 536 [85 S.Ct. 453, 13 L.Ed.2d 471] (1965)]; *Edwards v. South Carolina,* [372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)]; *Terminiello v. Chicago,* [337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)]; *cf. Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

These principles acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission. *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211–12, 1 L.Ed.2d 1311 (1957). With these general rules in mind, the Court can now con-

sider whether the Policy sweeps within its scope speech which is otherwise protected by the First Amendment.

B. *Overbreadth*

1.

■ Doe claimed that the Policy was invalid because it was facially overbroad. It is fundamental that statutes regulating First Amendment activities must be narrowly drawn to address only the specific evil at hand. *Broadrick v. Oklahoma,* 413 U.S. 601, 611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button, supra* 371 U.S. at 433, 83 S.Ct. at 845–46. A law regulating speech will be deemed overbroad if it sweeps within its ambit a substantial amount of protected speech along with that which it may legitimately regulate. *Id.* 413 U.S. at 612, 93 S.Ct. at 2915; *Houston v. Hill,* 482 U.S. 451, 458–60, 107 S.Ct. 2502, 2507–08, 96 L.Ed.2d 398 (1985); *Kolender v. Lawson,* 461 U.S. 352, 359 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983); *Gooding v. Wilson,* 405 U.S. 518, 521–22, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408 (1972).

The Supreme Court has consistently held that statutes punishing speech or conduct solely on the grounds that they are unseemly or offensive are unconstitutionally overbroad. In *Houston v. Hill, supra,* the Supreme Court struck down a City of Houston ordinance which provided that "[i]t shall be unlawful for any person to assault or strike or in any manner oppose, molest, and abuse or interrupt any policeman in the execution of his duty." The Supreme Court also found that the ordinance was overbroad because it forbade citizens from criticizing and insulting police officers, although such conduct was constitutionally protected. *Id.* 482 U.S. at 460–65, 107 S.Ct. at 2508–10. The fact that the statute also had a legitimate scope of application in prohibiting conduct which was clearly unprotected by the First Amendment was not enough to save it. In *Gooding v. Wilson, supra,* the Supreme Court struck down a Georgia statute which made

it a misdemeanor for "[a]ny person [to], without provocation, use to or of another, and in his presence ... opprobrious words or abusive language, tending to cause a breach of the peace." The Supreme Court found that this statute was overbroad as well, because it punished speech which did not rise to the level of "fighting words," as defined in *Chaplinsky v. New Hampshire, supra.* The Supreme Court struck down a similar ordinance in *Lewis v. New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), on the same grounds. In *Papish v. University of Missouri,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), the Supreme Court ordered the reinstatement of a university student expelled for distributing an underground newspaper sporting the headline "Motherfucker acquitted" on the grounds that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency." *Id.* at 670, 93 S.Ct. at 1199. Although the Supreme Court acknowledged that reasonable restrictions on the time, place, and manner of distribution might have been permissible, "the opinions below show clearly that [plaintiff] was dismissed because of the disapproved *content* of the newspaper." *Id.* Most recently, in *Texas v. Johnson, supra,* the Supreme Court invalidated a Texas statute prohibiting burning of the American flag on the grounds that there was no showing that the prohibited conduct was likely to incite a breach of the peace. These cases stand generally for the proposition that the state may not prohibit broad classes of speech, some of which may indeed be legitimately regulable, if in so doing a substantial amount of constitutionally protected conduct is also prohibited. This was the fundamental infirmity of the Policy.

2.

The University repeatedly argued that the Policy did not apply to speech that is protected by the First Amendment. It urged the Court to disregard the Guide as "inaccurate" and look instead to "the manner in which the Policy has been interpreted and applied by those charged with its

enforcement." However, as applied by the University over the past year, the Policy was consistently applied to reach protected speech.

On December 7, 1988, a complaint was filed against a graduate student in the School of Social Work alleging that he harassed students based on sexual orientation and sex. The basis for the sexual orientation charge was apparently that in a research class, the student openly stated his belief that homosexuality was a disease and that he intended to develop a counseling plan for changing gay clients to straight. *See* Discipline File 88–12–21, described *supra*. He also related to other students that he had been counseling several of his gay patients accordingly. The student apparently had several heated discussions with his classmates over the validity and morality of his theory and program. On January 11, 1989, the Interim Policy Administrator wrote to the student informing him that following an investigation of the complaints, there was sufficient evidence to warrant a formal hearing on the charges of sex and sexual orientation harassment.[13] A formal hearing on the charges was held on January 28, 1989. The hearing panel unanimously found that the student was guilty of sexual harassment but refused to convict him of harassment on the basis of sexual orientation. The panel stated:

> In a divided decision the hearing panel finds that the evidence available to the panel indicates that _____ did not harass students on the basis of sexual orientation under the strict definition of "The University of Michigan Policy on Discrimination and Discriminatory Harassment by Students in the University Environment." In accordance with First Amendment rights to free speech and the

University's policy of academic freedom, _____ did not violate the policy by discussing either the origins or "curability" of homosexuality in the School of Social Work.

Although the student was not sanctioned over the allegations of sexual orientation harassment, the fact remains that the Policy Administrator—the authoritative voice of the University on these matters—saw no First Amendment problem in forcing the student to a hearing to answer for allegedly harassing statements made in the course of academic discussion and research. Moreover, there is no indication that had the hearing panel convicted rather than acquitted the student, the University would have interceded to protect the interests of academic freedom and freedom of speech.

A second case, which was informally resolved, also demonstrated that the University did not exempt statements made in the course of classroom academic discussions from the sanctions of the policy. On September 28, 1988, a complaint was filed against a student in an entrepreneurship class in the School of Business Administration for reading an allegedly homophobic limerick during a scheduled class public-speaking exercise which ridiculed a well known athlete for his presumed sexual orientation. Complaint No. 88–9–05. The Policy Administrator was able to persuade the perpetrator to attend an educational "gay rap" session, write a letter of apology to the *Michigan Daily*, and apologize to his class and the matter was dropped. No discussion of the possibility that the limerick was protected speech appears in the file or in the Administrator's notes.

A third incident involved a comment made in the orientation session of a preclin-

**13.** The letter stated in part:
One type of complaint alleges that you have engaged in discrimination and/or discriminatory harassment on the basis of sexual orientation. Specifically the complaints allege the following:
1. You have made harassing statements in class and in classroom buildings to other students and/or faculty that are intimidating, hostile, and demeaning on the basis of sexual

orientation. Specifically _____ complains that you have stated repeatedly that homosexuality is an illness that needs to be "cured".
2. You have made several anti-gay comments to other students, specifically to _____ stating that homosexuality is abnormal and unnatural.
Although the Policy required identification of the complainants, these names were withheld from the Court to protect their privacy.

ical dentistry class. The class was widely regarded as one of the most difficult for second year dentistry students. To allay fears and concerns at the outset, the class was broken up into small sections to informally discuss anticipated problems. During the ensuing discussion, a student stated that "he had heard that minorities had a difficult time in the course and that he had heard that they were not treated fairly." Complaint No. 88–9–07. A minority professor teaching the class filed a complaint on the grounds that the comment was unfair and hurt her chances for tenure. Following the filing of the complaint, the student was "counseled" about the existence of the policy and agreed to write a letter apologizing for making the comment without adequately verifying the allegation, which he said he had heard from his roommate, a black former dentistry student.[14]

The manner in which these three complaints were handled demonstrated that the University considered serious comments made in the context of classroom discussion to be sanctionable under the Policy. The innocent intent of the speaker was apparently immaterial to whether a complaint would be pursued. Moreover, the Administrator generally failed to consider whether a comment was protected by the First Amendment before informing the accused student that a complaint had been filed. The Administrator instead attempted to persuade the accused student to accept "voluntary" sanctions. Behind this persuasion was, of course, the subtle threat that failure to accept such sanctions might result in a formal hearing. There is no evidence in the record that the Administrator ever declined to pursue a complaint through attempted mediation because the alleged harassing conduct was protected by the First Amendment. Nor is there evidence that the Administrator ever informed an accused harasser during mediation negotiations that the complained of conduct might be protected. The Administrator's manner of enforcing the Policy was constitutionally indistinguishable from a full blown prosecution. The University could not seriously argue that the policy was never interpreted to reach protected conduct. It is clear that the policy was overbroad both on its face and as applied.[15]

## C. Vagueness

Doe also urges that the policy be struck down on the grounds that it is impermissibly vague. A statute is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning." *Broadrick, supra* 413 U.S. at 607, 93 S.Ct. at 2913. A statute must give adequate warning of the conduct which is to be prohibited and must set out explicit standards for those who apply it. *Id.* "No one may be required at the peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). These considerations apply with particular force where the challenged statute acts to inhibit freedoms affirmatively protected by the constitution. *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). However, the chilling effect caused by an overly vague statute must be both real and substantial, *Young v. American Mini–Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and a narrowing construction must be unavailable before a court will set it

---

**14.** Only a single complaint involving allegedly harassing remarks made in the context of a classroom discussion was dismissed because of First Amendment concerns. A complaint of anti-semitic harassment was filed on March 27, 1989, by a Jewish student in a class on the Holocaust who was offended by another student's suggestion that Jews cynically used the Holocaust to justify Israel's policies toward the Palestinians. Complaint No. 89–3–2. Accordingly to the Administrator's notes, the perpetrator refused to apologize for the comment. The Administrator phoned the complainant and informed her that the comment was protected speech, not covered by the policy.

**15.** The Court's finding that the University interpreted the Policy to reach constitutionally protected speech makes it unnecessary to consider whether the Policy was susceptible to a saving construction. *See Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 493–503, 105 S.Ct. 2794, 2796–2801, 86 L.Ed.2d 394 (1985).

aside, *Screws v. United States,* 325 U.S. 91, 98, 65 S.Ct. 1031, 1033, 89 L.Ed. 1495 (1945).

■ Looking at the plain language of the Policy, it was simply impossible to discern any limitation on its scope or any conceptual distinction between protected and unprotected conduct. The structure of the Policy was in two parts; one relates to cause and the other to effect. Both cause and effect must be present to state a prima facie violation of the Policy. The operative words in the cause section required that language must "stigmatize" or "victimize" an individual. However, both of these terms are general and elude precise definition. Moreover, it is clear that the fact that a statement may victimize or stigmatize an individual does not, in and of itself, strip it of protection under the accepted First Amendment tests.

The first of the "effects clauses" stated that in order to be sanctionable, the stigmatizing and victimizing statements had to "involve an express or implied threat to an individual's academic efforts, employment, participation in University sponsored extracurricular activities or personal safety." It is not clear what kind of conduct would constitute a "threat" to an individual's academic efforts. It might refer to an unspecified threat of future retaliation by the speaker. Or it might equally plausibly refer to the threat to a victim's academic success because the stigmatizing and victimizing speech is so inherently distracting. Certainly the former would be unprotected speech. However, it is not clear whether the latter would.

Moving to the second "effect clause," a stigmatizing or victimizing comment is sanctionable if it has the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts, etc. Again, the question is what conduct will be held to "interfere" with an individual's academic efforts. The language of the policy. alone gives no inherent guidance. The one interpretive resource the University provided was withdrawn as "inaccurate," an implicit admission that even the University itself was unsure of the precise scope and meaning of the Policy.

During the oral argument, the Court asked the University's counsel how he would distinguish between speech which was merely offensive, which he conceded was protected, and speech which "stigmatizes or victimizes" on the basis of an invidious factor. Counsel replied "very carefully." The response, while refreshingly candid, illustrated the plain fact that the University never articulated any principled way to distinguish sanctionable from protected speech. Students of common understanding were necessarily forced to guess at whether a comment about a controversial issue would later be found to be sanctionable under the Policy. The terms of the Policy were so vague that its enforcement would violate the due process clause. *See Cramp v. Board of Public Instruction,* 368 U.S. 278, 285–88, 82 S.Ct. 275, 279–281, 7 L.Ed.2d 285 (1961).

## VI. CONCLUSION.

### A.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52. However, at this juncture, a few additional observations of a general nature would seem to be in order. As the Court noted at the hearing on August 25, 1989, there is nothing in the record to suggest that the University looked at the experience of any other university in developing its approach to the problem of discriminatory harassment. Had it done so, it might have discovered that Yale University, a private institution not subject to the strictures of the First Amendment, faced a similar dilemma pitting its efforts to promote equality against its commitment to free speech. In 1986, a sophomore at Yale was put on probation for two years by a University discipline board for disseminating a malicious flier intended to ridicule the homosexual community. The board eventually reversed the sanction, but only after a second hearing was held at which the student was represented by historian C. Vann Woodward, author of the University's 1975 report on free speech. N.Y.

Times, Oct. 15, 1986, at A27. That report concluded that "freedom of expression is a paramount value, more important than civility or rationality." N.Y. Times, Sept. 22, 1986, at B4. Writing about the case, Professor Woodward observed:

It simply seems unnatural to make a fuss about the rights of a speaker who offends the moral or political convictions passionately held by a majority. The far more natural impulse is to stop the nonsense, shut it up, punish it—anything but defend it. But to give rein to that inclination would be to make the majority the arbiters of truth for all. Furthermore, it would put the universities into the business of censorship.

New York Times, Oct. 15, 1986, at A27.

While the Court is sympathetic to the University's obligation to ensure equal educational opportunities for all of its students, such efforts must not be at the expense of free speech. Unfortunately, this was precisely what the University did. From the Acting President's December 14 memorandum forward to the adoption of the Policy and continuing through the August 25 hearing, there is no evidence in the record that any officials at the University ever seriously attempted to reconcile their efforts to combat discrimination with the requirements of the First Amendment. The apparent willingness to dilute the values of free speech is ironic in light of the University's previous statements of policy on this matter. In 1977, the Regents adopted the "Statement on Freedom of Speech and Artistic Expression: The Rights and Obligations of Speakers, Performers, Audience Members, and Protesters at the University of Michigan" (Statement) which "reaffirm[ed] formally [the University's] deep and lasting commitment to freedom of speech and artistic expression." The Statement provides in part that

freedom of speech must not ordinarily be restricted, governed or curtailed in any way by content except where the law, as interpreted by the Supreme Court of Michigan or the Supreme Court of the Unit-

ed States, holds that such an expression does not fall within constitutionally protected free speech. In all instances, the University authorities should act with maximum constraint, even in the face of obvious bad taste or provocation. The belief that some opinion is pernicious, false, or in any other way detestable cannot be grounds for its suppression.[16]

Needless to say, the philosophy expressed in the Statement is diametrically opposed to that reflected in the Acting President's December 14 Memorandum. Apparently, no one involved in the drafting process noted the apparent inconsistency with the Regents' views as expressed in the Statement.

Throughout the case, the University's counsel strenuously urged that First Amendment concerns held a top priority in the development and administration of the Policy. Counsel repeatedly argued that the University interpreted the Policy to reach conduct such as racial slurs and epithets in the classroom directed at an individual victim. However, as the Court observed in its August 25, 1989 bench opinion,

what we have heard here this morning ... from University counsel is a revisionist view of the Policy on Discrimination and Discriminatory Harassment by Students in the University Environment, and it is a view and interpretation of the Policy that was not in the minds of the legislators when it was adopted. And there is nothing in the record that has been presented to the Court which suggests that this was an appropriate interpretation of the policy.

Not only has the administrative enforcement of the Policy been wholly inconsistent with counsel's interpretation, but withdrawal of the Guide, see supra at 13, and the eleventh hour suspension of section 1(c), see supra at 8, suggests that the University had no idea what the limits of the Policy were and it was essentially making up the rules as it went along.

---

16. The Statement was redrafted by the University's Civil Liberties Board in 1988. The new Statement, substantially identical to the old, was formally re-enacted by the Regents at their July 1988 meeting.

### B.

In his famous treatise on constitutional law, Thomas Cooley, Justice of the Michigan Supreme Court and Professor of Law at the University's Law School, came out as an early and forceful proponent of an expansive interpretation of the First Amendment. He reasoned that even if speech

> exceed[s] all the proper bounds of moderation, the consolation must be that the evil likely to spring from the violent discussion will probably be less, and its correction by public sentiment more speedy, than if the terrors of the law were brought to bear to prevent the discussion.

T. Cooley, *A Treatise on the Constitutional Limitations* 429 (Da Capo ed. 1972) (1st ed. 1868). This observation appears as compelling today as when it was first written over one hundred and twenty years ago.

### ADDENDUM

Inexplicably the Court did not become aware of a conference on legal story telling at the University's Law School in April 1989 until after its Opinion was docketed. Important for consideration of a broader perspective of the issues put by the Policy and the Court's holding of unconstitutionality under the First Amendment is a paper delivered at the conference by Mari J. Matsuda, an associate professor of law at the William S. Richardson School of Law at the University of Hawaii: *Public Response To Racist Speech: Considering the Victim's Story*, 87 Mich.L.Rev. 2320, August 1989.* Professor Matsuda's description of her purpose amply describes the significance of the paper:

> This Article attempts to begin a conversation about the first amendment that acknowledges both the civil libertarian's fear of tyranny and the victims' experience of loss of liberty in a society that tolerates racist speech. It suggests criminalization of a narrow, explicitly de-

fined class of racist hate speech, to provide public redress for the most serious harm, while leaving many forms of racist speech to private remedies.... This is not an easy legal or moral puzzle, but it is precisely in these places where we feel conflicting tugs at heart and mind that we have the most work to do and the most knowledge to gain.

---

* The Opinion was signed and filed around noon on September 22, 1989. The August 1989 issue of the Law Review, while delivered by mail to chambers that morning, was not first read by the Court until that evening. An earlier awareness of Professor Matsuda's paper certainly would have sharpened the Court's view of the issues.