Ted D. Ayres, General Counsel Kansas Board of Regents 700 S.W. Harrison Suite 1410 Topeka, Kansas 66609-3760
Dear Mr. Ayres:
As general counsel and director of governmental relations for the Kansas board of regents (the board) you request our opinion on the constitutionality of the racial and sexual harassment policies of the regents institutions. The board has directed "[e]ach Regents institution [to] develop and maintain specific policies which seek to: (i) identify prohibited conduct in [the areas of racial and sexual harassment]; (ii) educate campus constituencies with regard to these negative behaviors; (iii) eliminate such behaviors; and (iv) set forth the manner in which such behaviors or conduct are to be addressed." Policy statement of the Kansas board of regents, Board Policy Manual, item 21 at page 10G. The focus of your inquiry is whether the policies violate the United States constitution's first amendment guarantee of free speech which is applicable to the states by incorporation through the fourteenth amendment due process clause. Fiske v. Kansas, 274 U.S. 380, 71 L.Ed. 1108,47 S.Ct. 655 (1927).
We will treat the racial and sexual harassment policies separately due to their slightly different characteristics.
I. Racial Harassment Policies
You have provided the racial harassment policies from Pittsburg state university (PSU), the university of Kansas (KU), the university of Kansas medical center (KUMC), Kansas state university (KSU), Emporia state university (ESU), Fort Hays state university (FHSU), and Wichita state university (WSU). After reviewing these policies, we are of the opinion that they do indeed contain first amendment infirmities, but that they can easily be amended so that they would withstand a challenge on this basis.
We begin our examination using the KU racial harassment policy as an example. The definition of racial and ethnic harassment contained in both the KU student handbook (at 27-28) and the KU equal opportunity and affirmative action policies (at 4) is as follows:
 "1. Behavior or conduct addressed directly to an individual(s) and that threatens violence or property damage, or incites imminent lawless action, and that is made with the specific intent to harass or intimidate the victim because of race, religion, ethnicity or national origin; or
 "2. `Fighting words,' such as racial and ethnic epithets, slurs, and insults, directed at an individual(s) with intent to inflict harm or injury or that would reasonably tend to incite an immediate breach of the peace, or
 "3. Slander, libel, or obscene speech that advocates racial, ethnic, or religious discrimination, hatred, or persecution."
A. Fighting Words
 University of Kansas
Section 2 of the above-quoted policy regulates "fighting words." Traditional fighting words doctrine has allowed regulation of speech which is "directed to the person of the hearer," Cohen v. California,403 U.S. 15, 20, 29 L.Ed.2d 284, 291, 91 S.Ct. 1780 (1971), Cantwell v.Connecticut, 310 U.S. 296, 309, 84 L.Ed. 1213, 1221, 60 S.Ct. 900
(1940), and which is likely "by [its] very utterance [t]o inflict injury or tend to incite an immediate breach of the peace." Chaplinsky v. NewHampshire, 315 U.S. 568, 572, 86 L.Ed. 1031, 1035, 62 S.Ct. 766 (1942). The KU policy is a clear attempt to embody the traditional doctrine.
The United States Supreme Court has, however, held that the long-standing presumption, that content-based regulations of speech are invalid, applies with equal force to fighting words even though they are unprotected speech. R.A.V. v. St. Paul, 505 U.S. 377, 120 L.Ed.2d 305,317, 112 S.Ct. 2538 (1992). "The rationale of the general prohibition . . . is that content discrimination `raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" R.A.V., 120 L.Ed.2d. at 320 citing Simon Schuster,Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105,116 L.Ed.2d 476, 487, 112 S.Ct. 501 (1991). Because the KU policy specifies "racial and ethnic epithets, slurs, and insults" as the type of speech covered by its fighting words ban, it is a content-based regulation and impermissible under R.A.V. This is true even though the language may be argued to be merely exemplary rather than part of the regulation itself. See Doe v. University of Mich., 721 F. Supp. 852 (E.D.Mich. 1989). (court relied upon an interpretive guide issued by the university along with its policy on discrimination and discriminatory harassment to find that the policy itself reached constitutionally protected speech).
The Court in R.A.V. did enumerate certain exceptions to the general prohibition against content-based regulations, i.e. instances in which the threat of government control of ideas is not present. A content-based regulation may be permissible if the regulation "consists entirely of the very reason the entire class of speech at issue is proscribable," 120 L.Ed.2d. at 320, if the regulation is aimed only at the "`secondary effects' of the speech, so that the regulation is justified without reference to the content of the . . . speech," 120 L.Ed.2d at 321, or if the regulation is for any other reason the sort "that does not threaten censorship of ideas." 120 L.Ed.2d at 324. Additionally, a regulation may survive constitutional challenge if it is narrowly tailored and "necessary to serve the asserted [compelling] state interest."120 L.Ed.2d at 326. The Court found, however, that the city ordinance at issue in R.A.V. did not fall within any of the exceptions and held the ordinance against fighting words which "one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender," 120 L.Ed.2d at 315, to be facially unconstitutional. [Although the regulation in R.A.V. was not as clearly directed at fighting words as the KU regulation, its language had been previously interpreted by the Minnesota supreme court to reach only fighting words and the United States Supreme Court deferred to this interpretation. 120 L.Ed.2d at 316.]
We reach a similar conclusion with regard to the KU fighting words ban. The policy does not focus on a particular category of fighting words as more likely, because of the mode of speech, to incite violence than other categories of fighting words, but rather focuses on the content, i.e. expression of views on a disfavored subject. See R.A.V.,120 L.Ed.2d at 323. As in R.A.V., the KU policy is not aimed at secondary effects within the meaning of Renton v. Playtime Theaters, Inc.,475 U.S. 41, 89 L.Ed.2d 29, 106 S.Ct. 925 (1986). "Listener's reactions to speech are not the type of `secondary effects' we referred to inRenton." Boos v. Barry, 485 U.S. 312, 321, 99 L.Ed.2d 333, 108 S.Ct. 1157
(1988). "The emotive impact of speech on its audience is not a `secondary effect.'" Ibid.
It may be argued that the intent of the policy is not to affect free expression, but rather to address racial discrimination and harassment in the university as a work place under title VII, 42 U.S.C.A. sec. 2000e, and as an entity providing federally funded educational benefits under Title VI of the civil rights of 1964, 42 U.S.C.A. sec. 2000d. The majority opinion in R.A.V. suggested that fighting words that may produce a violation of title VII (and presumably title VI as well) would not be protected. This statement, however, was premised on the fact that title VII (and title VI) do not target speech on the basis of its expressive content. By contrast, the KU fighting words policy is clearly directed at speech rather than conduct and does not define this form of harassment narrowly enough to be viewed as "swept up incidentally within the reach of a statute directed at conduct. . . ." 120 L.Ed.2d at 322. This is true even though the policy may be part of an attempt to comply with title VII and title VI. [The footnotes to the office for civil rights (OCR) investigative guidance on racial incidents and harassment against students, 59 Fed.Reg. 47, 11448 and 11450 (1994), indicate that it is directed at conduct rather than speech and that the "OCR cannot endorse or prescribe speech or conduct codes or other campus policies to the extent that they violate the First Amendment. . . ."] See discussion below, pp. 12, 13, for policy language that would be a permissible attempt to meet title VI and title VII obligations.
Finally, the purpose for the ordinance in RAV was identical to the university's expressed purpose for its policy. The Supreme Court found this purpose inadequately compelling to except the ordinance from the general prohibition against content-based regulations. In R.A.V., the city argued that its ordinance was intended to serve the compelling interest of "ensur[ing] the basic human rights of members of groups that have historically been subjected to discrimination." 120 L.Ed.2d at 325. The university of Kansas and the board have expressed a similar purpose for their regulations. The board's policy on racial and sexual harassment provides: "The Board of Regents is particularly concerned about the continuing societal problems of racial harassment and sexual harassment. It is the policy of the Board that such conduct cannot and will not be tolerated at the institutions under its governance and control." Board Policy Manual, item 21 at page 10G. Similarly, the KU racial harassment policy is prefaced with the statement that "[c]ommitted to fostering dignity and respect among all members of the community, the university prohibits racial and ethnic discrimination and harassment in all their forms." KU Student Handbook at 27. Presumably, the Supreme Court would find that these important interests of the university and the board, which are very similar to those of the city in R.A.V. are not compelling enough to justify the content-based regulation of fighting words in this manner.
The fundamental question of whether the R.A.V. rationale applies to the situation at hand has been resolved by at least one circuit. The fourth circuit court of appeals has specifically applied the rationale of R.A.V. to the university setting stating that "[a]lthough the Court in St. Paul reviewed the constitutional effect of a city `hate speech' ordinance, and we review the constitutionality of sanctions imposed for violating University policy, St. Paul's rationale applies here with equal force."Iota v. George Mason Univ., 993 F.2d 386 (4th Cir. 1993). In Iota, the court examined the issue of whether the university had a compelling reason to punish only that conduct contrary to the university's mission of promoting sexual and racial equality. The court concluded that "[t]he University certainly has a substantial interest in maintaining an educational environment free of discrimination and racism, and in providing gender-neutral education. Yet it seems equally apparent that it has available numerous alternatives to imposing punishment on students based on the viewpoints they express." 993 F.2d at 393. Likewise, KU should look to alternatives other than imposing content-based sanctions on speech.
The dissent in Iota took the position that the majority opinion was contrary to a line of Supreme Court decisions setting forth the general proposition that school officials have greater latitude in proscribing the conduct of students than is normally allowed in other settings. The Supreme Court has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines Indep. Community Sch.Dist., 393 U.S. 503, 507, 21 L.Ed.2d 731, 738, 89 S.Ct. 733 (1969). However, the Court has also averred that "the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." Healy v. James,408 U.S. 169, 180, 33 L.Ed.2d 266, 279, 92 S.Ct. 2338 (1972).
In view of these competing positions, the Iota dissent makes a good point. Nevertheless, the Iota majority "reaffirmed [its] dedication to the principles of the Bill of Rights upon which our vigorous and free society is founded." Healy, 33 L.Ed.2d at 287. Therefore, "[a] College, acting . . . as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." Id. at 283. Though not binding in this jurisdiction, this language certainly seems to foreclose any argument that a content-based policy is justifiable on the basis of a university's compelling interest in eradicating racism on its campus. See also Coreyv. The Leland Standord Junior University, Case no. 7040309 (Ca.Sup.Ct. 1995).
 Kansas State University
Of the other universities in the regent system, only KSU has a fighting words regulation. In its student life handbook at 109, KSU prohibits:
 "2. Physical, verbal, or written behavior or conduct addressed directly to an individual or small group of individuals that:
 b. makes use of insulting or `fighting' words or nonverbal symbols which by their very utterance inflict injury or naturally tend to provoke a violent reaction or incite an immediate breach of the peace."
On its face, this portion of the regulation satisfies both the Cohen
test by regulating speech "addressed directly to an individual or small group of individuals" and the Chaplinsky standard by requiring that the speech must "by [its] very utterance inflict injury or naturally tend to provoke a violent reaction or incite an immediate breach of the peace."
However, in section 2.a.(i)-(iii), the policy proscribes certain behaviors (which will be discussed later) with the specific requirement that they be "based on the race, ethnicity, or racial affiliation of the individual(s)." Section 2.a. is connected to the fighting words regulation in section 2.b. by the conjunctive "and" instead of the disjunctive "or." Therefore, technically the regulation may be seen to require that the fighting words be based on race or ethnicity. Thus while the fighting words prohibition standing on its own is content-neutral, its connection to the obviously content-based prohibition may render it an impermissible content-based policy.
Additionally, KSU should be cautious in its use of the phrase "makes use of insulting or `fighting words' . . ." While this may simply be intended as an alternative description of legally proscribable fighting words, it may be viewed as an attempt to regulate that speech which certain individuals or groups of individuals will find insulting or offensive. "The Supreme Court has consistently held that statutes punishing speech or conduct solely on the grounds that they are unseemly or offensive are unconstitutionally overbroad." Doe v. University ofMich., 721 F. Supp. 852, 864 (E.D.Mich. 1989).
Finally, whether or not a particular incident would be punishable as fighting words is a factual determination to be made on a case-by-case basis. It is instructive that "[t]the
[Supreme] Court has not upheld a conviction on the basis of the fighting words doctrine since Chaplinsky." Stone et al., ConstitutionalLaw 1100 (2d Ed. 1991). The history of the enforcement of the policy may be viewed by a Court as evidence of whether its scope is permissible or, alternatively, is overbroad. See e.g. Doe v. University of Mich., supra.
B. Obscenity, Libel and Slander
 University of Kansas
The Supreme Court has held that these categories of speech, like fighting words, are generally unprotected. See Miller v. California,413 U.S. 15, 37 L.Ed.2d 419, 93 S.Ct. 2607, reh'g den. 414 U.S. 881,38 L.Ed.2d 128, 94 S.Ct. 26 (1973) and Roth v. United States, 354 U.S. 476,1 L.Ed.2d 1498, 77 S.Ct. 1304 (1957) (obscenity); Gertz v. Robert Welch,Inc., 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974) and New YorkTimes Co. v. Sullivan, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964) (libel).
However, the KU policy, which proscribes only such "[s]lander, libel or obscene speech that advocates racial, ethnic, or religious discrimination, hatred, or persecution," is presumptively invalid on its face as it is clearly content-based. In R.A.V., the Supreme Court made clear that regulations of these categories of speech may not be made with respect to their content where there is a danger of "censoring a particular literary theme" [R.A.V. v. St. Paul, 120 L.Ed.2d at 318, citingNew York v. Ferber, 458 U.S. 747, 763, 73 L.Ed.2d 1113, 1126,102 S.Ct. 3348 (1982)]; or where there is an "attempt to suppress the communication of particular ideas" (id., citing Ferber concurring opinion of Justice O'Connor at 73 L.Ed.2d at 1134). Specifically, the Court stated that "the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government." Id. Furthermore, to hold otherwise "would mean that a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government. Such a simplistic, all-or-nothing approach to First Amendment protection is at odds with common sense and with our jurisprudence as well." Id.
 Kansas State University
KSU faces the same challenges as KU as its policy prohibits "[s]lander, libel, or obscene speech that advocates racial or ethnic discrimination, hatred or persecution."
None of the other university policies regulate obscenity.
C. Behavior or Conduct that Threatens Violence or Incites Imminent Lawless Action
 University of Kansas
The first section of the KU policy addresses "behavior or conduct." Student Handbook at 27. While "[t]he First Amendment literally forbids the abridgment only of `speech,' . . . [the Supreme Court has] long recognized that its protection does not end at the spoken or written word." Texas v. Johnson, 491 U.S. 397, 404, 105 L.Ed.2d 342, 353,109 S.Ct. 2533 (1989). Expressive behavior will be within the governance of the first amendment if "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."Spence v. Washington, 418 U.S. 405, 410-411, 41 L.Ed.2d 842, 847,94 S.Ct 2727 (1974). However, as to violence, the Court has stated that "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection." Roberts v. United StatesJaycees, 468 U.S. 609, 628, 82 L.Ed.2d 462, 478, 104 S.Ct. 3244 (1984).
The KU regulation of threats and incitement explicitly bars "behavior or conduct" without specifying whether it would punish only purely physical conduct or if verbal expression would also be within the reach of the regulation. Assuming the regulation is intended only to reach violent physical behavior or conduct, we are of the opinion that this regulation is permissible on the basis of the United States Supreme Court's decision in Wisconsin v. Mitchell, 508 U.S. ___, 124 L.Ed.2d 436,113 S.Ct. 2194 (1993). In that case, the Court upheld a Wisconsin statute which enhanced the maximum criminal penalty for an offense if the defendant "[i]ntentionally selects the person against whom the crime . . . is committed or selects the property which is damaged . . . because of the race, religion, color, disability, sexual orientation, national origin or ancestry of that person or the owner or occupant of that property." 124 L.Ed.2d 442 n. 1. The Court reasoned that even though provisions regulating fighting words must be content-neutral, "the ordinance struck down in R.A.V. was explicitly directed at expression (i.e., `speech' or `messages') . . . [whereas] the statute in this case is aimed at conduct unprotected by the First Amendment." (Emphasis added).
Thus, the critical difference is that it is generally more likely that the state's purpose in enacting a regulation of violent physical conduct will be compelling enough to override the general prohibition against content-based regulations. Indeed, unlike its decision in R.A.V., the court found that "[t]he State's desire to redress these perceived harms [e.g. likelihood of provoking retaliatory crimes, infliction of distinct emotional harms on the victims and incitation of community unrest] provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases."124 L.Ed.2d at 447. If KU shares these concerns, it is likely that its regulation, as far as it is directed only to physical conduct or behavior, is permissible even though content-based. This appears equally true even though the university regulations are not merely a penalty enhancement. The California supreme court has stated that its hate crime statute "punishes the discriminatory threat of violence, not the thought behind it . . . [T]he prohibition on discriminatory threats of violence contained in [the statute] does not present a `realistic possibility that official suppression of ideas is afoot.'" In re M.S., 896 P.2d 1365
(Cal. 1995), citing R.A.V. supra, 120 L.Ed.2d at 322.
A contrary result may be reached if the statute is directed at verbal conduct or expressive behavior. Proscribing threats and incitement not involving physical behavior or conduct in a content-based fashion generally would not be permissible. See State v. Kearns, 642 A.2d 349,359 (N.J. 1993).
 Kansas State University
The KSU student life handbook prohibits:
 "2. Physical, verbal, or written behavior or conduct addressed directly to an individual or small group of individuals that:
 a. based on the race, ethnicity, or racial affiliation of the individual(s) is intended to:
 (ii) threaten the individual(s) with unlawful violence or property damage; or
(iii) incite imminent lawless action."
The same analysis and conclusion reached above apply to this regulation. Speech which threatens or incites may only be proscribed in a content-neutral manner. Regulation of physical threats and conduct, on the other hand, may contain content-based proscriptions as long as there exists a compelling reason to regulate in a content-based manner.
 Pittsburg State University
Although the PSU racial harassment policy does not address threats, Article 34D.4., the student conduct code in the PSU student handbook defines harassment and/or intimidation as "[c]onduct causing alarm or recklessly creating a risk by: threatening to commit crimes against persons or their property and violation of the University sexual harassment and racial harassment policies." p. 33.
A threat has been defined as an "expression of an intent to inflict evil, injury, or damage on another." (Emphasis added). U.S. v.Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990). While this definition implies that actual intent is required, courts have stated that a lesser level of intent ("causing alarm" or "recklessly creating a risk") may be permissibly punished if "the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." United Statesv. Kelner, 534 F.2d 1020, 1027 (2d Cir. 1976).
However, the same concerns arise as to what type of conduct (physical or verbal) is punishable under the policy. None of the other universities' policies address threats and incitement in a similar manner.
The foregoing discussion indicates that generally universities may regulate fighting words, obscenity, libel, slander, verbal threats, and incitement only in a content-neutral manner. However, the mere inclusion of the facially neutral regulations in a "racial harassment policy" itself seems to invade their content-neutrality. If this is indeed the case, the universities are left with the challenge of addressing important concerns about racial harassment in a constitutionally sound manner. We believe the solution is the placement of content-neutral regulations of the above categories in a general student conduct code and the adoption of a racial harassment policy of the type embraced by PSU, KSU and FHSU. Using the PSU policy as an example, the policies state:
 "Racial harassment includes but is not limited to verbal, physical or written abuse directed toward an individual or group, which has the purpose or effect of all of the following:
 1) creating an intimidating, hostile, or offensive work or educational environment for an individual or group;
 2) interfering with an individual's or group's work, academic performance, living environment, personal safety, or participation in any University-sponsored activities;
 3) threatening an individual's or group's employment or academic opportunities." PSU Student Handbook, Article 21 at 29; PSU Human Resources Services Information Memorandum No. 1-3; PSU Unclassified Handbook at 41. See also ESU Student Handbook at 23.
Both KSU (Faculty Handbook at 115-16) and FHSU (Faculty Handbook at 36, 39) have essentially the same regulation, however each of these policies proscribes "conduct" rather than "abuse."
The language of the policies is apparently based on that of title VII of the 1964 civil rights act, 42 U.S.C. § 2000e et seq., which prohibits discriminatory employment practices based on an individual's race, color, religion, sex or national origin.
As discussed previously, the United States Supreme Court in R.A.V. indicated that regulating certain fighting words as violations of title VII would be permissible even though content-based because "a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech." 505 U.S. 377, 120 L.Ed.2d 305, 322, 112 S.Ct. 2538 (1992). Thus, if discriminatory speech is severe, pervasive or persistent, it may produce a hostile environment violative of title VII or title VI and be remediable under the above-quoted policy. Otherwise, occasional racial slurs, obscenities or verbal threats unfortunately may not be sanctioned by the universities within the constraints of the first amendment.
Case law demonstrates the relationship between the "hostile environment" type regulations and those discussed earlier that deal with specific categories of speech such as fighting words, incitement, threats, etc. "For example [a] comment . . . does not necessarily tend to incite violent reaction even if it demeans the addressee [sic] and creates an intimidating, hostile or demeaning environment." UWM Post,Inc. v. Board of Regents of the Univ. of Wis. Sys., 774 F. Supp. 1163,1178 (E.D.Wis. 1991). Thus, it may indeed take less than incitement (or some other type of unprotected speech) to create a hostile environment; while on the other hand, even if a hostile environment exists, offensive speech does not necessarily rise to the level of unprotected speech. The education notice from the department of education gives some examples of OCR decisions that have found a hostile environment to exist in violation of title VI. See e.g., "Defiance College, OCR Case No. 05-90-2024 (violation where college was aware of `repeated' and `patently offensive' verbal and physical racial harassment committed by students)" and "University of California, Santa Cruz, OCR Case No. 90-91-6002 (no finding of racial harassment where OCR found only isolated individual incidents over three-year period)." See59 Fed. Reg. 11,452 (1994). Because the question is clearly a factual matter to be determined on a case-by-case basis, the universities must remain keenly aware of their "duty to provide a nondiscriminatory environment that is conducive to learning," 59 Fed Reg. 11,449 (1994), and employ appropriate responsive measures.
D. Interfering with an Individual's or Group's Work, Academic Performance, Living Environment, Personal Safety, or Participation in any University-Sponsored Activities
This category is apparently a derivative of the hostile environment cases in which courts have stated that hostile environment sexual harassment occurs when workplace conduct, "`has the purpose or effect ofunreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" (Emphasis added). Ward v. Johns Hopkins Univ., 861 F. Supp. 367, 373
(D.Md. 1994). For that reason, we feel the discussion pertaining to hostile environment regulations is equally relevant to this type of regulation.
The Ward formulation is echoed by the education notice which states that "A violation of title VI may . . . be found if a recipient has created or is responsible for a racially hostile environment — i.e., harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with orlimit the ability of an individual to participate in or benefit from theservices, activities or privileges provided by a recipient. (Emphasis added). Education Notice, 59 Fed. Reg. 11,449 (1994).
In Doe v. University of Michigan, 721 F. Supp. 852 (E.D. Michigan 1989), the district court examined the university's policy which prohibited
 "1. Any behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race . . . and that
 b. Has the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts, employment, participation in University sponsored extracurricular activities or personal safety."
The court found this provision of the policy unconstitutionally vague stating "[a]gain, the question is what conduct will be held to `interfere' with an individual's academic efforts. The language of the policy alone gives no inherent guidance." 721 F. Supp at 867. The university of Michigan regulation is virtually identical to those of PSU, KSU and FHSU.
The Doe court's rationale seems disingenuous. After all, courts had been successfully applying essentially this same language to title VII cases in the employment context. Why the court felt that the language somehow lost its clear meaning in the academic context is unclear. The likely explanation is that the court was simply unwilling to extend title VII analysis to educational settings. We are not persuaded by the court's analysis in Doe and thus believe that such policies would withstand scrutiny under a vagueness challenge.
E. Threatening an Individual's or Group's Employment or Academic Opportunities
The court in Doe found vague the clause of the university of Michigan harassment policy which proscribed
 "1. Any behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race . . . and that
 "a. Involves an express or implied threat to an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety."
The policies of the Kansas universities having a similar regulation embrace a narrower version, generally proscribing conduct/abuse that "has the purpose or effect of "[t]hreatening an individual's employment or academic opportunities." PSU Student Handbook at 29; KSU Faculty Handbook at 115; FHSU Faculty Handbook at 35, 39; and ESU Student Handbook at 23 and Policy and Procedures Handbook.
The court in Doe questioned the university of Michigan's policy stating:
 "It is not clear what kind of conduct would constitute a `threat' to an individual's academic efforts. It might refer to an unspecified threat of future retaliation by the speaker. Or it might equally plausibly refer to the threat to a victim's academic success because the stigmatizing and victimizing speech is so inherently distracting. Certainly the former would be unprotected speech. However, it is not clear whether the latter would." 721 F. Supp. at 867.
Although we are not aware of any cases or other authority specifically discussing a similar regulation, it seems likely that the regulation would be deemed valid as it is similar to the other regulations based on title VII.
F. Guaranteed Freedoms Policies
You included the handbook for faculty and other classified staff from the KUMC and excerpts from the faculty handbook of WSU, neither of which contained a racial harassment policy nor any regulations which remotely resembled those already discussed. The "policies" illustrate a libertarian view towards the rights and obligations of students in the university setting thus we have dubbed them "guaranteed freedoms policies."
Section I.9 of the KUMC handbook for faculty and other unclassified staff contains a general statement on "human rights:"
 "The University of Kansas, recognizing essential human dignity and the equality of all men, is dedicated to the principle that all benefits, privileges, and opportunities afforded by the University shall be accorded to each person — student, faculty member, or employee — according to . . . individual merits, accomplishments, and needs, and that no rights or benefits shall be denied to anyone by reason of race or creed or by reason of sex unless sex is a bona fide qualification." (Emphasis added). p. 160.
Similarly, the WSU student handbook and the faculty handbook guarantees to students the "Protection of Freedom of Expression. Students should be free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled." Faculty Handbook, 5.011/Student Bill of Rights: Joint Statement on Rights and Freedoms of Students, Article I at 2. Furthermore, the faculty ethics statement provides that "[a]s teachers, faculty members encourage the free pursuit of learning in their students." Faculty Handbook, 4.093 at 22. Apparently the WSU student handbook contains these provisions. However, the excerpt you provided was incomplete.
Neither the KUMC nor the WSU policies pertaining to students contains any type of "racial harassment policy." In fact, the WSU handbook contains no grievance procedure for violations of the "Freedom of Expression" policy, although there is a procedure which may be used by faculty when disputes arise as to "the proper interpretation of faculty rights, responsibilities, and privileges . . ." WSU Faculty Handbook, 4.092 at 22. KUMC states that "the University is pledged to the establishment of procedures necessary to ensure that no violation of these principles shall be present in its affairs . . ." Handbook for Faculty, I.9 at 160. However, we assume that no grievance policy exists as it was not provided with your opinion request.
The absence of racial harassment policies and grievance procedures is conspicuous in light of the fact that both WSU and KUMC have well-defined faculty sexual harassment policies including grievance procedures. See WSU Faculty Handbook 1, WSU Student Handbook at 25, and KUMC Handbook for Faculty and Other Unclassified Staff at 161.
While there can be no first amendment challenges to policies such as these, the lack of grievance procedures exposes WSU and KUMC to heightened title VI liability. "If the [university] does not have a policy that prohibits the conduct of racial harassment, or does not have an accessible procedure by which victims of harassment can make their complaints known to appropriate officials, agency capacity — and thus constructive notice — is established." Education Notice,59 Fed. Reg. 11,450 (1994).
Recommendation
On the basis of the above discussion, it appears that a more appropriate and constitutionally sound treatment of the racial harassment problem would consist of the following: (1) A general statement of the purpose and mission of the racial harassment policy; (2) content-neutral regulations of unprotected categories of speech (fighting words, incitement, threats, obscenity, libel and slander) placed in the general student conduct code; and (3) inclusion of only title VII language in the actual "Racial Harassment Policy."
First, the general statement of the purpose of the racial harassment policy will be considered when determining the state's interest in enacting racial harassment policies and procedures. For example, the United States Supreme Court in Wisconsin v. Mitchell, 508 U.S. ___,124 L.Ed.2d 436, 113 S.Ct. 2194 (1993), held that a Wisconsin statute enhancing the maximum criminal penalty for a violent physical offense if the defendant had a racial motive was constitutional on the basis of Wisconsin's asserted interest in enacting the statute. See supra at 9.
Second, placing the content-neutral regulations in the general conduct code presumably removes all uncertainty as to their infringement on first
amendment rights. The universities may still punish students for these types of conduct that are racially biased — not because they are racially based, but because they are unprotected categories of speech. So long as the universities do not punish discriminatorily, they are not losing any power to eliminate verbal or expressive conduct that rises to the level of unprotected speech. In addition, as to violent conduct, the universities may be able to adopt a penalty enhancement provision where, for instance, a student who commits a violent physical act with a racial motive may be required to undergo racial sensitivity training in addition to the provided penalty. This may be permissible under Wisconsin v.Mitchell, 508 U.S. ___, 124 L.Ed.2d 436, 113 S.Ct. 2194 (1993). Furthermore, by doing so, the universities may be taking steps to avoid title VI liability under the "hostile environment" formulation if they are able to punish those types of speech which also happen to be racially motivated.
Third, the policies of PSU, FHSU and KSU appear to be necessary and sufficient to both provide a nondiscriminatory environment, about which the universities are undoubtedly genuinely concerned, and to comply with title VI in the event that racial tension reaches the level of a "hostile environment." To avoid a vagueness challenge, however, it is suggested that the universities make clear to students that repeated violations of the student conduct code involving racial animous, "even where each would not on its own constitute harassment, [i.e., offensive speech such as racial slurs or jokes] may collectively rise to the level of harassment under this definition." KSU Student Life Handbook at 109. In addition, the universities may include examples of the types of behaviors found to have created a hostile environment by the office for civil rights in the education notice. 59 Fed Reg. (1994).
In our opinion, the combination of these factors would serve the board's and the universities' cumulative interest in suppressing racial hostility while still complying with the requirements of the United States constitution and federal law.
II. Sexual Harassment Policies
Several of the policies use language that almost exactly mirrors that of the definition of sexual harassment offered by the federal equal employment opportunity commission (EEOC) found in 29 C.F.R. § 1604.11. In fact, KUMC actually cites the EEOC guidelines as the foundation for its own. This is reasonable because "the EEOC's definition has become the standard one." Edward J. Costello, Jr., Sexual Harassment After theCivil Rights Act of 1991, 23 U. West L.A. L. Rev. 21 (1992). Using the WSU policy as an example, these policies provide:
 "Sexual harassment is defined in terms of unwelcome conduct (sexual advances, requests for sexual favors, written or spoken sexual expressions, physical behavior of a sexual nature) under any of the following circumstances:
 "1. Submission to such conduct is either an implied or expressed condition for instruction, employment, or other campus activity.
 "2. Submission to or rejection of such conduct is used as a basis for evaluation.
 "3. Such conduct has the purpose or effect of unreasonably interfering with performance, or creating an intimidating, hostile, or demeaning environment." (Emphasis omitted). WSU Student Handbook at 26 and Faculty Handbook at 5. See also KU Handbook at 28; KUMC Handbook for Faculty and Other Classified Staff at 161; FHSU Faculty Handbook at 36, 39.
Other university policies do not so closely resemble the EEOC definition. However, a full reading of these policies indicates that the elements of the EEOC definition are included within their definitions of sexual harassment. See KSU Student Life Handbook at 84-85 and Faculty Handbook at 113; WSU Faculty Handbook at 2-3; PSU Human Resources Services Information Memo No. 1-3 at 3; PSU Unclassified Handbook at 41 and Student Handbook at 29; and ESU Student Handbook at 23 and Policy and Procedures Handbook.
The EEOC definition suggests a similarity to the language of title VII of the 1964 civil rights act, 42 U.S.C. § 2000e et seq. which was discussed favorably by the United States Supreme Court in R.A.V. v. St.Paul, 505 U.S. 377, 120 L.Ed.2d 305, 112 S.Ct. 2538 (1992). Title VII provides in part:
 "It shall be unlawful employment practice for an employer —
 "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or
 "(2) to limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.
In fact, "[a]ny questions that may have existed as to whether sexual harassment was a form of discrimination were dispelled over a decade ago, when the [EEOC] issued guidelines defining sexual harassment as a prohibited form of sex discrimination under Title VII." Susan C. Hastings John F. Lewis, Sexual Harassment in Education 4 (2d Ed. 1994). Therefore, title VII and the EEOC regulatory definition on sexual harassment are clearly complimentary.
The apparent obstacle, however, as discussed above, is that title VII by its specific language applies only to employment settings and some courts have been extremely vehement in their refusal to extend direct application of title VII to educational settings. See UWM Post, Inc. v.Board of Regents of the Univ. of Wis. Sys., 774 F. Supp. 1163, 1177
(E.D.Wis. 1991).
In our opinion, the obstacle is not a difficult one to overcome. In 1979, the United States Supreme Court recognized an implied right of action for students for discrimination under title IX of the education amendments of 1972, 20 U.S.C.A. secs. 1681-1688. Cannon v. University ofChicago, 441 U.S. 677, 60 L.Ed.2d 560, 99 S.Ct. 1946. Title IX provides:
 "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. sec. 1681(a).
Discrimination for the purposes of title IX has been defined by the office for civil rights as:
 "Verbal or physical conduct of a sexual nature, imposed on the basis of sex, by an employee or agent of a recipient that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under Title IX." See Susan C. Hastings John F. Lewis, Sexual Harassment in Education, 22 (2d Ed. 1994).
The definition set forth by the EEOC is simply, for all practical purposes, a more particularized version of the OCR definition. Because they share the same basic contours and because title VII (upon which the EEOC definition is based) has been used as the analysis for determining the title IX liability of an institution for the harassment of a student by an instructor [See Hastings v. Hancock, 842 F. Supp. 1315, 1318
(D.Kan. 1993)], it seems clear that the university sexual harassment policies which echo the EEOC definition are not only permissible but advisable.
The policies avoid the first amendment challenges levied against some of the racial harassment policies because although the sexual harassment policies will at times incidentally involve a content-based proscription of speech, they are permissible because "a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech." R.A.V. v. St. Paul, 505 U.S. 377, 120 L.Ed.2d 305, 322,112 S.Ct. 2538 (1992). All of the policies seem to be straightforward in their notice to students and faculty that sexual harassment is not restricted to actual physical contact that is sexual in nature or has sexual overtones. Clearly, "verbal abuse, pornography or perpetuation of sex-based stereotypes also may be considered sexual harassment," if pervasive, persistent or severe enough. Susan C. Hastings John F. Lewis, Sexual Harassment in Education 4 (2d Ed. 1994).
Finally, the universities should certainly be aware that they may not only be liable for the harassment of a student by a teacher (see Franklinv. Gwinnett County Pub. Schools, 503 U.S. 60, 117 L.Ed.2d 208,112 S.Ct. 208 (1992), but also for the harassing conduct of a student by other students although it may be a tougher case for the victim to establish. See Susan C. Hastings John F. Lewis, Sexual Harassment inEducation 24 (2d Ed. 1994).
In conclusion, the sexual harassment policies and enforcement mechanisms are constitutionally sound and well-founded in federal law and decisions.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Julene L. Miller Deputy Attorney General
CJS:JLM:jm